Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for pay, alleging that he was wrongfully separated from his civil service position with the Government in a reduction in force. He began to work for the New Orleans District, Corps of Engineers, as the foreman of an asphalt plant in 1932. An asphalt plant is a floating plant on which an asphalt mix is prepared and from which the mix is placed upon levee slopes or upper banks to prevent erosion. On or about July 26,1933, civil service status was accorded to the type of position which the plaintiff held. On May 12, 1946, the plaintiff was made a general foreman, Flood Control, Grade 23, a wage board position within the classified civil service.
The plaintiff for some time before and after August 1950, had been assigned to the Flood Fight Planning Section, Operations Division, New Orleans District, Corps of Engineers. He was foreman in charge of Asphalt Eepair Unit 221, a small floating plant. In August 1950, Unit 221 was in the hands of the Plant Branch for alterations and repairs. Alterations were to include the installation of a new fuel oil feed system to the burner of the main boiler. The plaintiff claimed that the proposed fuel feed system was dangerous; *410 that it would flare back and injure one who attempted to light it. The Chief, Operations Division, after investigation, disagreed with the plaintiff. On August 15,1950, the plaintiff was informed by his supervisor that the unit was still under the jurisdiction of the Plant Branch, and that until the alterations were completed and tested, and the unit turned back to the planning section, he should stay off the unit and leave it alone. On the next day the plaintiff went on the unit and attempted to light it. It flared back and he was burned.
The plaintiff on September 12 requested a grievance hearing alleging gross neglect on the part of the Chief, Operations Division. As remedial action the plaintiff requested the disciplining of the Chief for neglect of duty, the correction of the accident report of the flash-back so as to absolve the plaintiff from all blame, and an investigation by the Coast Guard to determine the safety hazards of the boiler on Unit 221. The District Engineer appointed a grievance board. He instructed the board that the plaintiff’s request for the disciplining of the Chief, Operations Division, for gross neglect of duty and for failure to obtain Coast Guard approval for the installation of the burner was not a proper subject for the consideration of the grievance board. A date for the hearing was set, but the plaintiff canceled his request for the hearing, giving as his reason the fact that the hearing, as limited, would not cover all phases of his grievance.
The above recital as to the accident to the plaintiff on Unit 221 might seem to be irrelevant, since the plaintiff does not claim to have lost any pay in connection with it. But the plaintiff claims that after he made the charges against the Chief, Operations Division, his superiors became prejudiced against him, and his subsequent separation resulted from that prejudice.
After the repairs on Unit 221 were completed, it was again placed in operation with the plaintiff as foreman in charge. He was directed not to attempt to light the boiler until properly instructed in its operation. When the instructor arrived, the plaintiff reiterated his numerous complaints about the safety of the boiler, and the instructor made some changes in the piping system. Thereafter the unit was operated, apparently satisfactorily, with the plaintiff as foreman.
*411 The revetments, damaged through neglect during the period of the war and by the hurricanes of 1947 and 1948, were repaired during 1948, 1949, and 1950, and that completed the work for which Unit 221 was created. In 1948 the unit worked 41 percent of the year, in 1949, 33 percent, and in 1950,17 percent. At the end of 1950 the unit was decommissioned and the positions on it were abolished in conformity with directions from higher authority to eliminate all unnecessary plant, work and positions. All personnel on the unit were laid off except the plaintiff, and one foreman who promptly applied for retirement. The Chief of the Division directed the plaintiff’s supervisors to see if they could locate a position within the division to which the plaintiff could be reassigned. No such position was found. Thereupon a Standard Form 52 was prepared, canceling plaintiff’s position in the Division. This was not a termination of employment with the New Orleans District. It was a transfer of the plaintiff from the Operations Division to the Personnel Branch for reassignment to any position within the District to which his qualifications and retention credits entitled him.
At the same time that the plaintiff’s position as general foreman, Grade 23, was declared surplus, the position of another foreman of the same grade, but in the Construction Division, was declared surplus. That foreman, one Hanks, had retention rights over another foreman, Lane, of the same grade, and also in the Construction Division, and he bumped Lane. Thereupon Lane was declared surplus, and, like the plaintiff, he was turned over to the Personnel Branch for reassignment. Thus two general foremen, Grade 23, were without positions, and were transferred to the Personnel Branch for reassignment in accordance with their retention rights. As was required by the regulations, the Personnel Branch set up a retention register. The extent of the competing areas and competing levels had been predetermined and in use since the original promulgation of the regulations.
On January 4, 1951, the plaintiff was given a “Notice of Probable Separation — Deduction in Force.” The notice advised him that he was entitled to any position for which he was qualified and which was held by a person with fewer *412 retention credits. The plaintiff’s reaction was that the whole affair was a reprisal resulting from the controversy about the fuel system on Unit 221, and he so wrote to his superiors on January 16. On January 22, the District Engineer wrote the plaintiff assuring him that no reprisals were involved, and that every effort would be made to find him as good a position as possible. On January 23, the plaintiff responded, repeating his charge that the Chief of Operations, the Section Head and the Field Supervisor were all taking revenge on him, and asking what action would be taken against them.
In the same letter the plaintiff pointed out that there were non-civil service foremen working in the District. In fact these were foremen of a lower grade and were temporary construction employees, hired under Schedule A of civil service rules, which meant that they were excepted from the competitive service. The Personnel Branch could have assigned the plaintiff to one of these positions, but did not do so because the plaintiff was a permanent civil service employee, with the rights pertaining to that status; there was a permanent civil service position available in the District, and it was intended that it should be offered to the plaintiff. That being so, if the plaintiff had been offered a temporary position, it would have been in violation of his rights, since it would not have been the best available position to which he was entitled, and we are sure, and the Personnel Branch was, no doubt, sure, that he would have reacted immediately and vigorously to such an offer.
On February 2,1951, the plaintiff was offered the permanent position of Caretaker, CPC-7, $3,725, Bonnet Carre Spillway, in the Operations Division, Flood Fight Planning Section. The plaintiff contended that it was not the best available position. He was furnished the register which listed all positions in his competitive area, and was asked to point out any position for which he was qualified and to which his retention points entitled him. He laid claim to a position of Engineer Equipment Inspector, WB-17, Step 5, $1.97 per hour. The Personnel Branch advised him that it thought he was not qualified for that position. It also advised him that if he could obtain a decision of the Civil Service Commission that he was so qualified, he would be *413 given the position. He was given the necessary forms, and was assisted in filling them out. They were sent to the proper official of the Civil Service Commission, who responded that in his opinion the plaintiff was not qualified for the position to which he laid claim.
On February 9, the plaintiff declined the Bonnet Carre Spillway position, asserting that there were higher positions to which he was entitled. He stated that the offer of the lower grade position was an act of reprisal on the part of his prior superiors, and that they would still be his superiors in the offered position. In fact his prior superiors had nothing to do with the offer. The Chief of the Personnel Branch recommended that the plaintiff accept the offer, since then he would remain on the rolls in an active status and it would be possible to transfer or promote him to a higher position when and if one became available. The plaintiff still rejected the offered position.
On February 10, 1951, the plaintiff was notified of his separation from the service effective February 10, because of a reduction in force and of his refusal to accept the offered position.
In the meantime, on February 5, the plaintiff had submitted a request for a grievance hearing, alleging that his removal from Unit 221 was due to reprisals and discrimina-tions, and not to a reduction in force. As remedial action he asked that he be not reduced in grade and salary and that he be assigned to another position at the same grade and salary until Unit 221 began to work again.
On February 7 the District Engineer advised the plaintiff that, in his opinion, he had no grounds for a grievance, and that his letter was not being referred to a grievance committee ; that the cancellation of the position of general foreman on Unit 221 was in accordance with his instructions and directives to reduce positions, employees and costs to the minimum; that the laying-off of Unit 221 had his specific approval and that there was no other position of the same grade and salary to which plaintiff could be reassigned, since the holders of all such positions had greater retention rights. The District Engineer informed the plaintiff of his right to appeal the decision, through channels, within ten days.
*414 The plaintiff took a timely appeal to tbe next higher echelon of command, the President of the Mississippi River Commission. Upon receipt of the appeal in the office of the Lower Mississippi Valley Division of the Corps of Engineers, the Assistant Division Engineer and the Division Personnel Officer were directed to proceed to New Orleans to investigate the plaintiff’s complaints and determine whether there had been any violation of his rights. They interviewed the plaintiff. He told them that if he had been offered the job to which he laid claim, that of Engineer Equipment Inspector, and for which he was held not to be qualified, he would not have accepted it. They checked the procedures which had been followed in effecting the plaintiff’s separation, and the facts in connection therewith, and determined that the plaintiff’s rights had not been violated. They advised him that he had the right to appeal any adverse decision of the Division Engineer to the Chief of Engineers, and to appeal his decision to the Secretary of the Army. The Division Engineer on February 20,1951, approved the action of the District Engineer in refusing the plaintiff a grievance hearing. He wrote:
* * * this appears to be a case where the exercise of management prerogative to reduce personnel does not meet with approval of the employee affected. The increase or decrease of the total number of employees in an organization or segment thereof is the responsibility of management and is not appealable by a subordinate in the absence of showing of the violation of personal rights. There is no such showing in the instant case.
The plaintiff was advised in writing by the District Engineer of his right to appeal from the decision of the Division Engineer, through channels, to the Chief of Engineers within ten days. The plaintiff did not so appeal.
During the summer of 1951 the large asphalt plant of the New Orleans District was reactivated and placed in service. This was not the small Unit 221 on which the plaintiff had worked. In staffing the large plant, the field supervisor in charge hired two non-civil service foremen, under an authority granted by the Civil Service Commission, and described in detail in finding 20. There was also, on the reactivated plant, an opening for a general foreman, Grade 23. Lane *415 was promoted to that position. It will be remembered that Lane had been bumped from such a position in 1950, and had been declared surplus at the same time as the plaintiff. He had fewer retention credits than the plaintiff. But he had been offered by the Personnel Branch, and had accepted, a position of Civil Engineer, GS-7. He had, before that time, qualified for a civil engineer position by taking a competitive examination given by the Civil Service Commission. He was, then, on the active payroll of the District at the time the Grade 23 position on the reactivated plant became open. As we have said, he was given the position.
On September 21,1951, the plaintiff asked the District Engineer why he had not been considered for employment on the asphalt plant, why Lane had been promoted to general foreman when he had fewer retention credits than the plaintiff, and why Smith, a non-civil service foreman had been appointed to a civil service position, while the plaintiff was on the reserve list. The District Engineer replied that the asphalt plant was expected to work only two months that year, and that all positions not filled by reassignment of permanent employees currently employed were manned by temporary labor on a job employment basis; that Civil Service Regulations did not give preference to former employees in such employments. He said that the plaintiff had been considered, but better qualified persons were available. He said that Lane was a permanent employee currently employed and that as between such a person and a former employee such as the plaintiff, in a lay-off status, retention credits had no application. The District Engineer’s interpretation of the regulations was in accord with the way they had always been interpreted.
On October 4,1951, the plaintiff appealed to the Regional Director, Tenth United States Civil Service Region. On December 11 the Regional Director advised the plaintiff that his rights had not been violated. On January 10, 1952, the plaintiff appealed to the Civil Service Commission. In that appeal the plaintiff asserted that he had been laid off because he had given the General Accounting Office information about alleged misconduct of officials of the Corps of Engineers. He also asserted that the Corps of Engineers was mis *416 using tlie authority to hire non-civil service employees fox-temporary work, thus keeping some persons from acquiring civil service status, and keeping civil service employees, such as the plaintiff, out of jobs. The Commission’s Board of Appeals and Review, to which the appeal was referred on February 27, 1952, affirmed the decisions of the Regional Director and the District Engineer.
Although the plaintiff did not specify it as a ground of complaint in the proceedings described above, he has asserted in this case that his rights were violated by the Government’s handling of the employment status of one Bergeron. Berger-on’s history was similar to Lane’s, and is recited in finding 24. The plaintiff had no valid ground for complaint about it.
On January 21,1952, which was 11 months after the decision of the Division Engineer affirming the District Engineer’s refusal to grant the plaintiff a hearing in connection with the reduction in force, the plaintiff wrote the Department of the Army, referring to a letter from the Department which had advised him that his case was within the jurisdiction of the Corps of Engineers. He said that the Department had “passed the buck” by referring him to the Corps of Engineers, the same agency which he was accusing of violating his rights.
The foregoing long narrative and comment shows that, in our opinion, the plaintiff has no ground for complaint as to his separation, so far as the merits are concerned. We have considered the merits because of the plaintiff’s assertion that his separation was an act of reprisal. In now considering whether the plaintiff’s procedural rights were violated, we point to one matter that is worthy of discussion.
It will be remembered that promptly after receiving his notice of probable separation because of a reduction in force, the plaintiff requested of the District Engineer a grievance hearing, alleging that his separation was due to reprisal and not to reduction in force. As remedial action he requested :
(a) that I not be reduced in grade or salary based on the fact that the Asphalt Repair Unit has not been sold or demolished and is merely in a seasonal lay-up status;
(b) that in view of the practice established in former years, I be reassigned to another position at the same *417 grade and salary until such time as the Asphalt Repair Unit begins work again.
The District Engineer concluded that since the grievance hearing was for the purpose of advising him as to alleged improper treatment of employees in his agency, and since he himself was the one who had ordered the asphalt unit laid up, which order caused the reduction in force, and since the plaintiff could not be retained at the same grade and salary unless he was to be paid without working, he, the District Engineer, would get no useful information from a grievance hearing. He recognized that his superiors could overrule his action as to the laying up of the unit or as to keeping the plaintiff on the payroll though his work was eliminated, and he advised the plaintiff as to his right to appeal to his, the District Engineer’s, superiors, and on, through channels, even to the Secretary of the Army.
We think the District Engineer was right. The hearing which the plaintiff claims he was entitled to was not provided for by a statute, but by a regulation of the Department of the Army. An agency which promulgates regulations has the right to give them a rational interpretation, so that compliance with them will not be a useless formality. If a grievance hearing such as the plaintiff requested had been held, the plaintiff would have insisted on threshing over the old straw of the oil burner fire and the reprehensible character of his superiors. The District Engineer knew that those things had nothing to do with the laying up of Unit 221 for lack of work, nor with keeping the plaintiff on his regular salary without a job. A request by an employee for remedial action which a responsible Government superior could not grant without abdicating his responsibility as the superior, does not rationally justify a hearing, and a regulation may be interpreted as not requiring a hearing in such a case.
In fact the plaintiff had all the essentials of a hearing when the Assistant Division Engineer and the Division Personnel Officer went to New Orleans and investigated the plaintiff’s grievance. If the plaintiff still thought that his rights had not been accorded him, either procedurally or on the merits, he had two more appeals which he could have taken, if necessary, to the Chief of Engineers and to the *418 Secretary of the Army. The regulations required that he appeal within ten days. Almost a year later he wrote the Department of the Army, refusing to ask the Chief of Engineers for relief because it was the Corps of Engineers that he was accusing of violating his rights. The plaintiff therefore neglected to use the remedial channels that were open to him within his agency.
It will be remembered that the plaintiff did appeal to the Regional Director of the Civil Service Commission, and from him to the Commission, receiving an adverse decision in each case. The Chief Law Officer of the Civil Service Commission, in an opinion which is quoted in finding 29, held that it was immaterial that an agency grievance board had not heard the plaintiff’s claim since he had appealed to the Commission, which had final authority to determine the propriety of an alleged reduction-in-force action.
For the several reasons given above, we conclude that no legal wrong was involved in the treatment which the plaintiff received. His petition will, therefore, be dismissed.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. On September 26,1932, plaintiff, a nonveteran, entered into temporary employment with the New Orleans District, Corps of Engineers, War Department, as Foreman Asphalt Plant, $2,200 per annum. Civil service status in that rating or classification was obtained on or about July 26, 1933. On May 12,1946, plaintiff became a general foreman, Flood Control, Grade 23, a Wage Board position within the classified civil service.
2. The general foreman classification, as used in the New Orleans District, covered a group of supervisory foremen whose experience and abilities were such as to enable them to be assigned to varied types of construction work. *419 Positions in this classification were interchangeable with each incumbent either knowing or being able to rapidly learn the work of the other. Plaintiff, because of his special knowledge and length of service in asphalt work, was an expert in that field. In his case this theory of interchangeability was not, in practice, actually utilized over a period of years.
3. Plaintiff, for a period both prior and subsequent to August 1950 had been assigned to the Flood Fight Planning Section, Operations Division, New Orleans District. In line of authority, plaintiff’s supervisors were W. C. Cobb, Division Chief; S. C. Blaize, Section Head; C. R. Dunn, Assistant Section Head and Field Supervisor. Plaintiff’s principal duty was foreman in charge of Asphalt Repair Unit 221, a small floating plant used during low water periods to prepare asphalt mixes for use in repairing revetted levee slopes and upper bank paving. Unit 221 was assigned to and operated under the Flood Fight Planning Section.
4. On August 16,1950, plaintiff was injured while attempting to light a cold boiler on Asphalt Repair Unit 221. The Unit had been transferred to the Plant Branch for alterations and repairs. Alterations were to include the installation of a new fuel oil feed system to the burner of the main boiler. Plaintiff strongly protested the type and method of installation, claiming that the intended fuel feed system was dangerous and would flare back and injure anyone attempting to light it. The Chief, Operations Division, after investigation, disagreed with the plaintiff. On August 15, 1950, plaintiff was infoi’med by his supervisor that Unit 221 was under the jurisdiction of the Plant Branch 'until such time as the alterations were completed and tested and the Unit turned back to the Flood Fight Planning Section for operation. Plaintiff was instructed by more than one of his supervisors to stay off the Unit and leave it alone. Plaintiff, acting contrary to instructions, attempted to light the cold boiler of Asphalt Repair Unit 221. A rollback, or flashback, occurred.
After repairs were completed, Asphalt Reheater Unit 221 was placed in operation with plaintiff as foreman in charge. Plaintiff was told not to attempt to light the boiler until *420 properly instructed in its operation. On arrival of the instructor, plaintiff reiterated his numerous complaints concerning the safety of the plant and some changes were made in the piping system by the instructor.
5. On or about September 12, 1950, plaintiff forwarded a letter through channels to the Chief of Engineers, Washington, D. C., presenting his version of the circumstances surrounding his injury on Unit 221. The letter was forwarded by indorsement of November 3, 1950, setting out that the letter had been withheld pending action on the grievance hearing and the receipt of a still further letter which plaintiff had stated would follow. When this letter was not forthcoming, the original letter was transmitted to higher authority to assure that all concerned would be cognizant of the matter and plaintiff’s complaints considered.
6. By letter of September 12, 1950, plaintiff requested a grievance hearing, alleging that
Due to gross neglect the Chief, Operations Division, failed to fulfill the responsibilities of his position in that he allowed a burner to be installed with knowledge and forethought of the danger involved to the employees whose post of duty is aboard the plant. This burner was installed without obtaining the approval and consent of the U. S. Coast Guard Marine Inspector.
Plaintiff sought as remedial action, (1) the disciplining of the Chief, Operations Division, for neglect of duty; (2) the correcting of accident report Form 92 so as to absolve him of all blame for the rollback or flashback; and (3) an investigation by the Coast Guard to determinate the safety hazards of the boiler aboard Unit 221. The original request of September 12 was supplemented by an additional request of September 25. In conformity with the provisions of Civilian Personnel Regulations, the District Engineer, by letter of September 29, 1950, appointed a grievance board. The scope of the hearing was prescribed and the designated board was informed that certain subject matter that plaintiff desired to place before it was not appropriate for consideration and no findings and recommendations would be made thereon. These were, specifically, the claimed “gross neglect of the Chief, Operations Division,” the disciplining *421 of that officer, and failure to obtain Coast Guard approval for the installation of the burner.
A grievance is defined by Civilian Personnel Regulations as:
An employee’s stated feeling of dissatisfaction with aspects of his working conditions and relationships which are outside his control.
The regulations also provide that a grievance board shall find facts, draw conclusions therefrom, and make recommendations, and further, that the Commanding Officer, or Management, will render a decision on facts ascertained by the board. The District Engineer, as provided by regulations, had caused an investigation to be made of the installation of Unit 221 and was satisfied as to its safety. The board was informed that it would be furnished a report of the investigation for its consideration and would not cause an additional investigation to be made. A date was set for the hearing by letter of October 2,1950. On October S, 1950, plaintiff withdrew his request for a grievance hearing, pointing out that, since he would not be allowed to cover all phases of his grievance, he desired to have the proposed hearing cancelled.
7. It was anticipated that the work scheduled for performance in 1950 by Asphalt Repair Unit 221 would conclude the work planned for the plant. The revetments, damaged through neglect during the war and the hurricanes of 1947 and 1948, were repaired in 1948, 1949 and 1950, completing the work for which the Unit was created. This work had been lessening through the years. In 1948 the Unit worked 41 percent of the year; in 1949, 33 percent; and in 1950 only 17 percent of full time. No work was performed by it in 1951,1952, and 1953. The Unit has now been declared surplus to the needs of the New Orleans District and turned over to the Chief of Engineers for circularization to other agencies within the Department. Following the 1950 season, the Unit was decommissioned and the positions thereon abolished in conformity with the directives of higher authority to eliminate all unnecessary plant, work, and positions. All personnel on the Unit were laid off with the exception of the plaintiff, and one foreman who promptly applied for retire *422 ment. The Chief of the Operations Division directed plaintiff’s supervisors to see if they could locate a position within the Division to which plaintiff could be reassigned. This was attempted, but no position coadd be found within the Division. Due to reduced personnel ceilings, directives of the Bureau of the Budget, and orders of the Chief of Engineers and the President of the Mississippi River Commission, the New Orleans District had, since 1948, been undergoing a continual reduction in force. As of July 1948 the civilian employees of the District numbered 2,965; in 1949 the number had been reduced to 2,888; in 1950 to 1,880; in 1951 to 1,622; and in 1952 to 1,523. The Wage Board employees, of which plaintiff was one, had, percentage-wise, suffered a more drastic reduction. This group numbered 1,295 as of Jody 1948; 1,339 in 1949; 601 in 1950; and 508 in 1951. Personnel of the Operations Division, to which plaintiff was assigned, had been reduced from in excess of 600 to 370. As no vacancy within the Division could be found, a Standard Form 52, Request for Personnel Action was prepared, canceling plaintiff’s position in the Division. The cancellation was not a termination of employment with the New Orleans District. It was a transfer of plaintiff from the Operations Division to the Personnel Branch for reassignment to any position within the District to which his qualifications and retention credits entitled him.
8. On or about the same date that plaintiff’s position as a general foreman, Grade 23, was declared surplus by the Operations Division, the Construction Division, another segment of the District, also declared the position of a general foreman surplus. This position became surplus when the incumbent, Valson Hanks, a general foreman with 18 retention credits and veterans preference, completed an assigned field job. Hanks had retention rights over Ruel H. Lane, a non-veteran general foreman, who was also assigned to the Construction Division. Hanks was reassigned by the Division to Lane’s job in accordance with his retention rights. Lane was declared surplus and, like plaintiff, he was turned over to the Personnel Branch for reassignment. Thus two general foreman positions within the District became surplus and the incumbents were reached for reduction in force. *423 Both, were transferred to the Personnel Branch for reassignment in accordance with their retention rights.
9. Upon receipt of the notification of the surplus positions, the Personnel Branch, in conformity with the provisions of applicable regulations, established a retention register. The extent of the competing areas and competing levels as required by regulations had been predetermined and in use since promulgation of the regulations.
10. On January 4, 1951, plaintiff was furnished “Notice of Probable Separation — Reduction in Force.” The notice advised him that his previous position had been abolished because of lack of work, that he was entitled to reassignment to any position for which he was qualified if those positions were held by employees with less retention credits, that it was impossible to fix a definite date for reassignment or separation, that the notice would be considered the 30-day notice period for separation as required by regulations, and that if no further advice was received by February 10 it could be assumed that the proposed separation would be unnecessary. Plaintiff immediately took exception to the reduction in force action and alleged by letter of January 16, 1951, that the abolishment of his position resulted solely from reprisals on the part of his supervisors because of his objections to the fuel system which had been recently installed on Asphalt Unit 221. On January 22, 1951, the District Engineer advised plaintiff that no reprisals would be visited upon him as a result of any actions undertaken in the line of duty. Assurances were given that every effort would be made to place plaintiff in the best possible position available. Plaintiff, by letter dated January 23, 1951, acknowledged receipt of the letter of J anuary 22,1951, and again alleged that his “so-called reduction in force” resulted from reprisals on the part of Messrs. Cobb, Blaize, and Dunn, and stated that he had not been told what action would be taken against such supervisors.
11. Plaintiff further stated in his letter of January 23, 1951, that there were other non-civil service foremen working in the District and new ones being hired. There were such persons working, but no new ones were being employed. These men were not general foremen (plaintiff’s classifica *424 tion) but were foremen of a lower grade. They were not working in the Operations Division and were not under the supervision of either Messrs. Cobb, Blaize, or Dunn, and none of these three officials could have placed plaintiff in the cited positions. The non-civil service foremen referred to were temporary construction employees, hired under authority of Schedule A of Civil Service rules (excepted from the competitive service) and, as set out in applicable regulations, were not in competition with plaintiff. The Personnel Branch could have assigned plaintiff to one of these positions, but refrained from so doing for good reasons. Plaintiff was a permanent civil service employee with definite rights within the purview of the Civilian Personnel Regulations. As such, he was entitled to reassignment to a permanent position if he was qualified for the position and had retention rights over the incumbent. Representatives of the Personnel Branch knew that there was such a position available in the District and planned to offer it to plaintiff. The offer of assignment to one of the existing temporary construction foreman positions would have been a violation of plaintiff’s rights, as it would not have been offering him the best available position to which he was entitled.
12. On February 2,1951, plaintiff was offered reassignment to the permanent position of caretaker, CPC-7, $3,725 per annum, Operations Division, Flood Fight Planning Section, Bonnet Carre Spillway. A review of plaintiff’s case had been made by the Personnel Branch and it was determined that the caretaker position was the highest paid and best available position for which plaintiff qualified and to which his retention rights entitled him. Plaintiff did not agree that the position was the best available one for which he was qualified and so informed the Personnel Branch verbally. In compliance with the authorized procedure, plaintiff was furnished with the retention register which listed all positions in the District in his competitive area. Plaintiff was asked to point out any position on the register for which he felt he was qualified and to which he was entitled because of superior retention rights. He identified two such positions: those of Marine Pipefitter, WB-16, Step 5, $1.90 per hour, and Engineer Equipment Inspector, WB-17, Step *425 5, $1.97 per hour. Plaintiff did not request consideration lor the Marine Pipefitter position and would not have been eligible for that position, as the incumbent had equal retention credits and was therefore not subject to being “bumped”. Plaintiff did make claim to the Engineer Equipment Inspector position. It was the opinion of the Personnel Branch that plaintiff did not meet the established qualification requirements for that job and he was so informed. Plaintiff was advised, however, that if he could establish his qualifications with the Civil Service Commission, he would be given the position. He was furnished a copy of the qualification requirements and was given assistance in the preparation of U. S. Civil Service Commission Form 57, Application for Federal Employment. Under date of February 8,1951, the executed form was forwarded to the Regional Director, Tenth Civil Service Region, for an advisory opinion as to whether plaintiff met the established qualification requirements for Engineer Equipment Inspector, Grade 17. The opinion of the Chief, Personnel Branch, that plaintiff did not meet the qualification standards for Engineer Equipment Inspector, Grade 17, was confirmed by the Regional Director, Tenth Civil Service Region, of the Civil Service Commission on February 15,1951.
13. On February 9, 1951, plaintiff declined the proffered position of Caretaker, CPC-7, under protest, alleging that the offer was unreasonable, as there were higher positions available to which he was entitled and that such positions were held by employees with lower retention rights. Plaintiff further stated that the offer of the lower grade position was due to prejudice and reprisals on the part of his prior supervisors and that the position offered was under the same supervisors. Plaintiff’s former supervisors did not have anything to do with the offer of the caretaker position. The offer was made solely by the Personnel Branch and not by anyone in the Operations Branch.
14. Plaintiff’s contention that the proffered caretaker’s job was a clerical one is unfounded. The job sheet for the position, dated June 17,1948, indicates that the caretaker is primarily a supervisory employee in charge of maintenance, alterations, repairs, construction, and inspection at the Spill *426 way so as to maintain it in a state of continual readiness for operation, and that the clerical work involved is negligible. This is also substantiated by other evidence. Any required typing could be performed in approximately 30 minutes daily and such typing would not have to be performed by the caretaker.
When plaintiff declined the position of caretaker under protest, the Chief, Personnel Branch, recommended that plaintiff accept it under protest, thus keeping him, on the rolls in an active status and thereby making it possible to transfer or promote him to a higher position when and if such a position became available. Plaintiff refused the advice and the position. He testified that at the time of the offer of the caretaker’s position he had an accumulation of 90 days’ annual leave that was worth, at the general foreman’s salary, in excess of $1,600 and that if he had accepted the caretaker’s position the value of such leave would have been decreased to approximately $1,100.
15. On February 9, 1951, plaintiff was notified of his separation from the service effective February 10, 1951, because of reduction in force and his refusal to accept the caretaker’s position.
16. In the meantime plaintiff had, on February 5,1951, submitted another request for a grievance hearing, alleging that his removal from the Asphalt Repair Unit was due to reprisals and discrimination and not to reduction in force. Plaintiff sought the following remedial action:
(a) that I not be reduced in grade or salary based on the fact that the Asphalt Repair Unit has not been sold or demolished and is merely in a seasonal lay up status;
(b) that in view of the practice established in former years, I be reassigned to another position at the same grade and salary until such time as the Asphalt Repair Unit begins work again.
By Indorsement of February 7, 1951, the District Engineer informed plaintiff that, in his opinion, he had no grounds for a grievance and that his letter was not being referred to a grievance committee; that the cancellation of the position of general foreman on Asphalt Repair Unit 221 was in accordance with his instructions and directives to reduce posi *427 tions, employees, and costs to the minimum; that the laying up of the Asphalt Unit had his specific approval and that there was no other position of the same grade and salary as he had formerly held to which he could be reassigned, as all such positions were filled by employees with higher retention credits and rights. Plaintiff was informed of his right to appeal the decision, through channels, to higher authority within 10 calendar days.
17. The Civilian Personnel Regulations make it the responsibility of management, the District Engineer in this case, to determine when and what reductions in personnel should be made in any reduction in force. The decision to lay up Unit 221 and abolish the positions thereon was that of the District Engineer. Such regulations do not contemplate that the District Engineer (management) will appoint a board of subordinates to review or approve his decisions. His superiors admittedly had that right and in advising plaintiff of his right to appeal to higher authority, the District Engineer was submitting his decisions to the proper authority for review. By Indorsement of February 7,1951, plaintiff timely availed himself of the right of appeal to higher authority. The District Engineer forwarded the appeal to the President, Mississippi River Commission, the next higher echelon of command, by indorsement of February 9,1951.
The applicable regulations provide that in the case of reduction in force actions, appeals may be taken on such tilings as:
(1) Violation of veteran preference rights;
(2) Excessive narrowness of competitive area or competitive level;
(3) Failure to make a reasonable offer of reassignment;
(4) Error in the retention group or subgroup, or error in counting retention credits;
(5) Error in the order of selection;
(6) Denial of reinstatement priority rights;
(7) Denial of right to examine the regulations or to inspect the retention registers or review statements of exception;
(8) Failure to give reasons for any exception to the regulations, or opportunity to answer such reasons, or to have due consideration of the answer.
*428 (9) Lack of an efficiency rating, failure to use efficiency rating, or use of inappropriate efficiency rating.
The District Engineer, had, as provided in CPU E2.5-3a (p. 9), personally learned of and investigated plaintiff’s often repeated complaints relative to alterations on Asphalt Repair Unit 221. He was convinced that the cancellation of plaintiff’s position and the offering of the lower grade job were due solely to a reduction in force. He had personally directed such reduction in force and specifically approved the laying up of the Asphalt Plant and cancellation of the general foreman position. It did not appear to him that there was anything to be gained by appointing another grievance board to consider known facts which had been previously considered.
18. Upon receipt of plaintiff’s appeal, the Division Engineer, Lower Mississippi Valley Division, directed the Assistant Division Engineer and the Division Personnel Officer to proceed to New Orleans to investigate plaintiff’s complaints, and determine whether there had been any violation of plaintiff’s rights. Plaintiff was interviewed by the two representatives of the Division Engineer on February 19, 1951. He was informed that the interview was not to be construed as a hearing. The procedures in effecting plaintiff’s reduction in force were checked with Civilian Personnel Regulations and it was determined that all requirements had been complied with. Plaintiff had been furnished the retention register and asked to name any job to which he felt he was entitled and for which he could qualify. Plaintiff had selected only one job, that of Engineer Equipment Inspector, Grade WB-17. The Civil Service Commission had on February 15,1951, stated that plaintiff was not qualified for this position. Plaintiff, during the interview, said that he would not have accepted this job if offered to him, as it was under the supervision of the Chief, Operations Division. Plaintiff’s actions in making claim for this job, and filing an application with the Civil Service Commission, were not taken in good faith.
Plaintiff was then personally informed that he had the right to appeal any adverse decision of the Division Engineer through channels to the Chief of Engineers and thence *429 to the Secretary of the Army. By indorsement of February 20, 1951, the Division Engineer approved the action of the District Engineer in refusing to grant a grievance hearing, stating:
* * * this appears to be a case where the exercise of management prerogative to reduce personnel does not meet with approval of the employee affected. The increase or decrease of the total number of employees in an organization or segment thereof is the responsibility of management and is not appealable by a subordinate in the absence of showing of the violation of personal rights. There is no such showing in the instant case.
The District Engineer was instructed to inform plaintiff of his right to request further review from the Chief of Engineers through channels within 10 calendar days. By letter of February 21, 1951, plaintiff was furnished copies of the District Engineer’s Indorsement of February 9 and the reply thereto as made by the Division Engineer. As instructed, plaintiff was informed of his appeal rights. This was in accordance with the provisions of the appropriate regulations (p. 15) which provide:
When the employee is not satisfied with the decision of the commanding officer, he will have the right to request a review of his case by successively higher echelons of review, up to and including the Employee Grievance Board or the Fair Employment Officer, Department of the Army.
The regulations specifically provide that such requests will be filed through channels within 10 calendar days of the receipt of decision of each higher echelon of command. Plaintiff did not avail himself of the opportunity to request a further review of his case. No appeal was at any time made through the prescribed channels.
19. On February 11, 1951, plaintiff forwarded a letter to the Eegional Director, Tenth Civil Service Eegion, New Orleans, citing work performed by him and objecting to being put in competition with other general foremen, Grade 23, who, plaintiff contended, did not possess his asphalt experience. This letter was regarded as an appeal from his reduction in force on the ground of being improperly placed in the same competitive level with other Grade 23 foremen *430 and not in a separate level of Ms own. By letter of March 16, 1951, to the District Engineer, the Civil Service Commission requested information on this phase of plaintiff’s complaints. Information on the interchangeability of general foremen, Grade 23, was furnished by letter of March 22, 1951. It was specifically stated therein that plaintiff was not displaced by another general foreman but was terminated as a result of the demobilization of the plant to which he was assigned and his refusal to accept a lower grade job, and that his being placed in a smaller competitive group would not have forestalled his separation under the circumstances. By letter of March 26, 1951, plaintiff was advised by the Regional Director that “the inclusion of your position in a narrower competitive level would have lessened your retention possibilities” and that it was the opinion of the Regional Office that the appeal should be denied. Plaintiff was given one week to refute or challenge the information furnished by the District Engineer and advised that if a reply was not submitted by April 2,1951, his appeal would be considered closed. Plaintiff did not reply to the above and made no further effort to challenge or refute the statement furnished. He was notified by letter of April 3,1951, that his case was considered closed and that Civil Service rules and regulations had not been violated in the reduction in force procedures followed.
20. During the summer of 1951, the large asphalt plant of the New Orleans District was reactivated and placed in service. This plant is not the small Asphalt Repair Unit 221 on which plaintiff had worked. The large plant was operated by the Construction Division and was used for the revetting .of banks and stream bottoms.and was essentially a higher labor unit; i. e., the plant was manned by a nucleus crew of permaneut Civil Service employees with the person in charge authorized to hire all other personnel at the site of the assigned work. This authority was delegated to the field supervisors by District Circular 30-9 of February 1, 1951. This District Circular superseded District Circular 30-9 of March 18, 1948, which contained the same provision as evidenced by plaintiff’s .use of the delegated authority in staffing his unit in the. field. ...Thoso persons, employed under *431 this authority were non-Civil Service temporary construction workers, excepted from the competitive service, hired for periods not to exceed 6 months, in accordance with Schedule A, paragraph 6.101 K of the Civil Service Regulations. Authority for the New Orleans District to hire temporary construction workers under Schedule A had been obtained years previously from the United States Civil Service Commission and had been specifically reauthorized on July 1, 1948. The policy of the Department of the Army is, and has been, to hire persons on the job site of construction projects, thus eliminating the cost of transporting crews of permanent employees from job site to job site and the payment of per diem to such employees. In staffing the large asphalt plant for the 1951 season, the field supervisor in charge hired two non-civil service foremen under the authority granted by the Civil Service Commission. The appointments were on a job employment basis not to exceed 6 months in any one location. At the same time, one Ruel H. Lane, mentioned above in finding 8, was assigned to the large asphalt plant. Lane was a general foreman, Grade 28, who, after being displaced by another general foreman with higher retention credits, had been declared surplus at the same time as plaintiff. As had been done with plaintiff, Lane was offered the next best job to which his retention credits and qualifications entitled him. This was the position of Civil Engineer, GS-7, Morganza Floodway. Lane had previously established eligibility as a Civil Engineer with the Civil Service Commission by competitive examination. Acceptance of the offer of Civil Engineer involved a reduction in pay. Lane accepted the position and remained on the permanent rolls so as to be eligible for promotion as plaintiff had been urged to do. When the large asphalt plant was activated there was a vacancy for a general foreman. Lane was promoted to this position.
21. On September 21, 1951, plaintiff asked the District Engineer why he had not been considered for employment on the asphalt plant, why Mr. Lane had been promoted to general foreman when he had less retention credits than plaintiff, why Mr. Floyd Smith, a non-civil service fore *432 man, had been appointed to a civil service position, while plaintiff was on the reserve list. He also asked whether the regulations with respect to qualifications for holding a position had been changed. On October 2, 1951, the District Engineer informed plaintiff that:
The asphalt revetment plant is a construction unit and because it is expected to work only two months this year, all positions not filled by reassignment of permanent employees currently employed were manned with temporary labor on a job employment basis. Civil Service Regulations do not give preference to former employees in such employments. You were considered but better qualified persons were available.
Mr. Lane was currently employed as a Construction Engineer, GS-7, at Morganza and was reassigned to the general foreman position on the revetment plant, for which he is thoroughly qualified. As between currently employed employees and former employees in lay off status “retention credits” have no bearing or application.
With respect to the first quoted paragraph above plaintiff was questioning the excepted appointments of the two temporary construction foremen hired under Schedule A of the Civil Service Hules. The Civilian Personnel Regulations provide that:
A single competitive level will not include both those positions subject to the Classification Act of 1949 and those not subject to the Act, nor will it include positions within and excepted from the competitive service.
These two temporary construction workers hired on excepted appointments on a job duration basis were not in competition with plaintiff nor was he with them. The regulations further provide as far as material that:
No position in the competitive service may be filled with an employee in retention group B or C (other than job employments') * * * so long as there is an available qualified employee on that installation’s reinstatement reserve list * * *. [Italics supplied.]
Retention Groups B and C are indefinite and temporary employees respectively.
22. It is an established policy of the Department of the Army and the New Orleans District to promote from within; *433 i. e., from employees currently employed, rather than recalling those from the reserve list or acquiring eligibles from the register. Lane had been reached for reduction in force at the same time as plaintiff. Like plaintiff, Lane had been offered reassignment to a lower grade job. Lane accepted whereas plaintiff did not, despite the recommendations of the Personnel Branch that he accept the job under protest so as to remain on the rolls and he eligible for promotion. When the opportunity for promotion arose, Lane was eligible and available as a currently employed employee and was given the promotion. Plaintiff, had he remained on the rolls, would no doubt have enjoyed similar eligibility.
23. The promotion of R. H. Lane to general foreman was of a temporary nature and not a permanent change of grade. Lane, caught in the same reduction in force as plaintiff, accepted the offer of a lower grade job and was reduced to Civil Engineer, GS-7 on February 18, 1951. On September 9,1951, when an opening for general foreman, Grade 23, arose. Lane was promoted to that position. On August 17, 1952, he was again reduced to Civil Engineer, GS-7. Plaintiff states that Lane was removed from the general foreman position as a subterfuge to get at him (plaintiff) in the reduction in force and then have Lane placed back in his grade following plaintiff’s termination. Plaintiff’s contention is not supported by the record. Seven months elapsed between plaintiff’s termination and Lane’s promotion and the promotion was only effected when a major piece of plant was reactivated.
24. Plaintiff has contended that one Clarence Bergeron was on the same retention list as plaintiff as a general foreman, Grade 23, at the time of plaintiff’s reduction in force and indicated that Bergeron too was demoted so as to get to plaintiff for reduction in force and then Bergeron was promoted to his old position after plaintiff’s termination. This contention is unfounded. Bergeron appears on the retention register, not as a general foreman, Grade 23, in plaintiff’s group, but as an Engineer Equipment Inspector, Grade 17. Berg-eron had, at one time, been a general foreman, Grade 23, but had been caught in the reduction in force when the large asphalt plant stopped operations in November 1950. Off er of *434 reassignment to a lower grade position, Engineer Equipment Inspector, Grade 17, was made to Bergeron. He accepted and was reduced in grade on November 19,1950. He was not on the retention register as a general foreman at the time of plaintiff’s reduction in force. Bergeron was subsequently promoted to general foreman, Grade 23, on October 21,1951, eight months after plaintiff’s termination, and reduced again to Engineer Equipment Inspector, Grade 17, on March 9, 1952. On October 5,1952, he was again promoted to general foreman, Grade 23, and was given an indefinite appointment in that grade on November 2,1952. Neither Bergeron’s promotions to general foreman, nor Lane’s, violated any of plaintiff’s rights during the year the plaintiff’s name appeared on the reemployment reserve list. Before demotions or promotions can be made there must exist bona fide vacancies in the higher or lower position. At varying times, the plaintiff, Lane, and Bergeron were reached for reduction in force and were offered reassignment to lower grade jobs. All but plaintiff accepted a lower job rather than leave the Federal Service.
25. Plaintiff alleges that prior to his reduction in force and during the one-year period his name was on the reemployment reserve list, non-civil service foremen were hired to fill civil service general foreman, Grade 23, positions of the type previously held by plaintiff. Those specifically named were Robert C. Carter and Floyd H. Smith. These men were employed on the large asphalt plant. Both men were at all times temporary construction workers hired on a “job employment” basis for a period not to exceed six months in any one job in any one location. The term “job employment” means employment for the duration of a specific project only. As stated in Finding 21, such positions were not in the competitive civil service, the incumbents were not in competition with plaintiff, nor was he in competition with them. As stated in Finding 20, the hiring of such individuals had been delegated to the field supervisor in charge of a particular project on the basis of authority granted by the Civil Service Commission. Under this system it was possible for one, so desiring, to remain almost continually employed on temporary appointments under au- *435 tibority of Schedule A by moving from job to job as is done in private construction work. Floyd Smith was almost constantly employed as shown by his employment record.
Floyd Smith never held the position of general foreman in the New Orleans District as claimed by plaintiff. His work was not that of a general foreman but he worked under the supervision of such a person. Robert C. Carter was in the same category as Floyd H. Smith, although his service was limited to a very brief period.
26. On October 4,1951, plaintiff appealed to the Regional Director, Tenth United States Civil Service Region, alleging that his reemployment rights had been violated by the promotion of Mr. Lane and the appointment of the two temporary construction workers on the large asphalt plant.
Under date of December 11,1951, the Director of the Tenth U. S. Civil Service Region, New Orleans, Louisiana, addressed the following communication to the plaintiff:
On the basis of your letter of October 4, 1951, this Regional Office has conducted a thorough investigation of your allegations that the District Corps of Engineers, New Orleans, Louisiana, has not complied with the requirements of Civil Service regulation 20.11 in promoting one employee and hiring two additional employees to do work on the Asphalt Mixing Plant while your name appeared on the reappointment reserve list.
Our investigation revealed that Mr. R. H. Lane was promoted, effective September 9,1951, from a position of Civil Engineer, GS-7, in the Baton Rouge field office of the District Corps of Engineers to a position of General Foreman, WB-23, Step 3, in the Asphalt Block Plant of the New Orleans District Corps of Engineers. As you know, Mr. Lane was reassigned as a result of reduction-in-force action, effective February 18,1951, from a position of General Foreman, WB-23, Step 4, to the position of Civil Engineer, GS-4, in the Baton Rouge field office. The promotion of Mr. Lane does not in any way violate or conflict with your rights on the reappointment reserve list. Regulation 20.11, which appears on page Zl-289 of the Federal Personnel Manual, paragraph (b), provides: “No position in the competitive service, for which there is a qualified person available on the reappointment reserve list, may be filed by appointment of an employee of a different agency, or by the new appointment of any person except a qualified 10-point pref *436 erence eligible.” [Italics supplied.] This provision of the regulation has consistently been interpreted to mean that the promotion of employees currently on the payroll may be effected without violating the rights of any employee on the reappointment reserve list.
In addition, the records of the District Corps of Engineers show that two Excepted Appointments have been made recently by the District Corps of Engineers to Foreman positions assigned to asphalt plant work. Mr. Eobert C. Carter was given an Excepted Appointment on September 17, 1951, not to exceed 90 days, in the capacity of Foreman, Construction, $1.77 per hour. Mr. Floyd H. Smith was given a temporary appointment on September 14,1951, not to exceed 90 days to the position of Foreman, Senior, $1.95 per hour. The authority for the appointment of each of these men is Schedule A-6.101 (K), which means that the appointments are excepted under Schedule A of the Civil Service, rules and regulations and are not subject to the requirements of the competitive civil service. The Excepted Appointmentsgiven by the District Corps of Engineers to Messrs. Carter and Smith do not in any way violate or conflict with your status on the reappointment reserve list. Please refer back to the quotation from the Federal Personnel Manual previously cited which starts: “No position in the competitive service_”.
You are advised that this office considers that your rights on the reappointment reserve list have not been violated either by the promotion of Mr. E. C. Lane or by the Excepted Appointments of Messrs. Eobert C. Carter and Floyd H. Smith. We have decided not to reconsider at this time any of the statements alleged by you relative to your previous reduction-in-force appeal, as well as our decision at that time that you are not qualified for reassignment to the position of Engineering Equipment Inspector, WB-17. These matters were very thoroughly considered at the time of your formal reduction-in-force appeal and there is no basis for reconsidering them at this time. Also, we consider the various allegations which have been made by you concerning the lack of qualifications of certain other employees of the District Corps of Engineers to be outside the scope of this investigation. Any complaints of this nature should be taken up through administrative and grievance channels of the Department of the Army.
*437 27. On January 10, 1952, the plaintiff sent the following letter of appeal to the U. S. Civil Service Commission, Washington, D. C.:
I was employed for 19 years as Civil Service Foreman by the Corps of Engineers at New Orleans, La. I was laid off Feb. 10, 1951, by a so-called reduction in force, but, the fact is, I was laid off for giving the General Accounting Office in New Orleans, La. an affidavit that the Corps of Engineers was misusing Government funds by falsifying the payrolls, employees were paid 8 hours per day when they were at home off duty, forty Government trucks and three cars and material used by individuals for pleasure. The investigation by the General Accounting Office revealed that my charges were true and I have a copy of the investigation. When I was laid off, 10 February 1951, supposedly by a reduction in force, my rating was General Foreman grade 23 step 5, $2.39 per hour. I was disqualified for all positions except caretaker with $100.00 per month cut in pay. I turned the job down because it was 85 percent typing and I cannot type. Therefore, I knew that I would get laid off for failing to do the job.
17 Sept. 1951, the Asphalt Plant was put in commission. I was on the recall reserve list, fully qualified, having been first Asphalt Plant Foreman ever to be put on U. S. Civil Service and, also, by a special appointment. But, instead of offering me a job, two non-Civil Service Foremen were assigned to the Plant who had never worked on the Asphalt Plant. I made a complaint to the 10th Civil Service Kegion at New Orleans, La. and received a decision as follows, and I quote: No Civil Service regulations have been violated as the two foremen assigned to the Asphalt Plant were not on competitive levels with you. Unquote. Now, of course, you know that if you lay off a Superintendent and put on a non-Civil Service Labor Foreman in his place, naturally, they are not on competitive levels, and that is what has happened in my case. Another method that is and has been going on in the Corps of Engineers, to side step Civil Service, is to hire an employee for ninety days and when the ninety days expires, he is terminated on a standard form #50 on 12 Nov. to accept another position and 13 Nov. he is shown working on the same job, same pay, same designation and no lost time. I have the form 50’s on some of the employees that will substantiate my charges and I know several hundred employees who have been kept off the Civil Service rolls *438 by the above method and it is now being used against me at this moment. The purpose of the method mentioned above, is to keep the ninety day employee from becoming civil service, and, at the same time, keep the civil service employee who is on the civil service register from securing a job. All of these facts have been called to attention of Mr. A. J. Leach, U. S. Civil Service Regional Director, New Orleans, La. and he has taken no action whatsoever.
It is important that I hear from you at once for unless I get a decision from you in my behalf, it will be necessary for me to file suit in Federal Court no later than 1 February 1952.
28. Under date of February 27, 1952, a letter was sent to the plaintiff, signed by Charles R. Anderson, Chairman, Board of Appeals and Review, to which Board the plaintiff’s appeal had been referred, as follows:
Reference is made to your appeal from the decision of the Tenth U. S. Civil Service Region relative to your allegation that the New Orleans District Engineer violated your rights under the provisions of Section 20.11 of the Commission’s Regulations relating to the reappointment reserve list.
The Commission’s Board of Appeals and Review has carefully considered all the facts in your case. It has been learned that you were separated through reduction in force procedures from the position of General Foreman, Grade 23, with the New Orleans District, Corps of Engineers, effective February 10,1951. Your name was placed on a reappointment reserve list for consideration for reappointment in the competitive service in accordance with the provisions of Section 20.11 of the Commission’s Retention Preference Regulations. In your letter of January 10, 1952, you stated that you believe your rights under that provision of the regulations were violated by the hiring of two- additional employees, Messrs. Carter and Smith, to do work on the Asphalt Mixing Plant while your name appeared on the reappointment reserve list for a position in the competitive service.
A review of the record discloses that Messrs. Carter and Smith were given temporary appointments not to exceed ninety days under authority of Schedule A-6.101 (K) of the Regulations, which means that the appointments were excepted under Schedule A of the Commission’s rules and regulations and are not subject- to the competitive Civil Service. Consequently, the excepted *439 appointments given to Messrs. Carter and Smith by the District Corps of Engineers do not in any way violate or conflict with your status on the reappointment reserve list.
Inasmuch as this study of your case by the Board of Appeals and Eeview has failed to disclose any violation by the employing agency of your rights under Section 20.11 of the Commission’s Retention Preference Regulations for the reason stated in the preceding paragraph, the decision of the Tenth Region is hereby affirmed.
29. An opinion prepared by the Chief Law Officer of the Civil Service Commission dated July 28, 1952, introduced in evidence by the defendant, contains, among others, the following statement with reference to a “grievance hearing”:
Petitioner now challenges the bona fides of his separation on February 10, 1951, through reduction-in-force (allegations 8 through 12). He asserts that had he been granted a grievance hearing by his agency, allegedly requested but denied him, that he would have shown that his removal from his position was due to the fact that he had complained of the negligent acts of certain officials as a result of which he sustained certain injury, and not due to a reduction-in-force. If this be so, petitioner’s letter of February 11,1951 (Exhibit 1) contains no indication that such a claim or charge was made by him to the Tenth United States Civil Service Region. We believe it would be immaterial that an agency grievance committee may not have heard petitioner’s present claim inasmuch as final authority rests with the Commission to determine the propriety of an alleged reduction-in-force action. The Regional Office was given no opportunity to review petitioner’s claim that his separation on February 10,1951, was due to reasons other than reduction-in-force and it would appear that the doctrine of estoppel may be invoked as a defense to this phase of his action. Furthermore the evidence is clear that petitioner has failed to exhaust administrative remedy which he was required to do under the statute and the Commission’s Regulations (See Johnson v. War Assets Administration, C. A. Illinois, 1949, 171 F. 2d 556, and cases in point in annotations following Sections 861 and 863, 5 U. S. C. A.). The petitioner was given the opportunity, which he did not take, to submit additional facts to rebut information furnished by the Corps of Engineers, or had he done so and the decision of the Regional Director were still adverse to him on the basis of such additional information, the Regulations provide for *440 further appeal to the Civil Service Commissioners from a decision of the Regional Director.
This opinion concluded with the following comment:
* * * While a further appeal to the Commissioners could have been taken by petitioner in an attempt to exhaust administrative remedy, nevertheless the Board’s decision may well be considered a final decision of the Commission in view of the fact that no other conclusion could have been reached by either the Regional Director or the Board of Appeals and Review based on controlling regulations referred to in both decisions.
30. On January 21,1952, plaintiff sent the following letter to the Department of the Army, Washington, D. C.:
This will acknowledge your letter, dated 9 Jan. 1952, in which you stated that my case was within the jurisdiction of office of the Chief of Engineers. I would like to call your attention to the Department of the Army Civilian Employee’s Manual #2 that plainly states that an employee who has a grievance will be given a hearing and be allowed to present all the facts in the case. The regulations further provide that if the employee is not satisfied with the decision, the employee may appeal to your office.
I requested a grievance in writing and was refused in writing by the Commanding Officer, Col. Charles G. Hollé, District Engineer, New Orleans District. And when I appealed to your office, you pass the buck and send my appeal back to the accused, the Corps of Engineers, to make the decision, who had already denied me a hearing. I feel that I am entitled to have a hearing and present all the facts as an American citizen under our form of Government. If our form of Government has changed that a citizen cannot get a hearing when he reports an agency for misusing the taxpayers money and is fired for doing so, then, we have adopted the Stalin type of Government.
It is strictly the duties of your Office to see that the regulations are carried out in the department, and, this, I must tell you frankly, you have not done.
31. The following excerpts are taken from Civilion Personnel Regulations No. E2, Employee Relations, Grievance Procedures, Department of the Army, dated 30 November 1948.
*441 FOREWORD
* * * * *
2. The scope of these regulations has been extended to include certain matters which heretofore have not been covered by the Department of the Army grievance procedure. Examples are reductions in force, separation for disqualification, * * *
Section 1
GENERAL PROVISIONS — AUTHORITY AND SCOPE
1 — 1.65. These regulations are published pursuant to Executive Order 9830 (see page Zl-201, Federal Personnel Manual) and have been approved by the Civil Service Commission and the Secretary of the Army. * * *
b. These regulations are effective and mandatory at all installations of the Department of the Army in the zone of interior and to United States citizen civilian personnel, wherever located. * * *
PURPOSE
1-3. The purpose of these regulations is (1) to provide an orderly system whereby employees may enhance their working conditions or relationships, and (2) to outline certain basic principles having to do with management’s relations with employee groups or organizations. Because grievances and misunderstandings may arise in any working situation, it follows that the initiation of a grievance in good faith should not cast any reflection on an employee’s good standing or on his loyalty and desirability to the organization. Similarly, occasional grievances should not be considered a discredit to the employee’s supervisor or the general management of the activity.
POLICY
1-4. It is the policy of the Department of the Army that employees will be treated fairly in all respects and will be privileged to discuss freely and to settle their problems with their supervisors. Further, that employees will be unimpeded and free from restraint, interference, coercion, discrimination, or reprisal in making complaints or in filing grievances under the authority of these regulations. The Department of the Army considers it to be a right of employees to present any matters *442 relating to their employment to their employers for consideration. * * *
* * * * *
SECTION 3
PRINCIPLES GOVERNING EMPLOYEE GRIEVANCES — PURPOSE
3-1. * * * The grievance procedure is of positive value to management in—
*****
5. Disclosing to management whether subordinate officials are evidencing a proper understanding and application of Department of the Army policies and regulations, as well as a proper exercise of administrative discretion.
*****
TIME AND BASIS POR GRIEVANCE
3-2. a. Grievances shall be submitted not later than 30 calendar days after the complainant learns of the alleged act or condition which prompts the grievance.
*****
o. An individual who has been separated involuntarily may, within 15 calendar days after receipt of notice of separation (see CPR SI), file a written request for review with the commanding officer of the installation under these regulations, provided the case does not fall under & (2) (a) above. * * *
# * $< * *
Section 5
RESPONSIBILITIES-GRIEVANCE COMMITTEE

Composition

5-4. a. A standing grievance committee will be appointed by each commanding officer to whom appointing authority has been delegated pursuant to Orders C, War Department, 6 June 1946. Commands having activities to which appointing authority has not been delegated are responsible for establishing sufficient facilities at the location of employment to carry out the principles enunciated in these regulations. Such facilities will be designed to complement the facilities otherwise existing at command headquarters or other servicing organization. The grievance committee will consist of three re *443 sponsible and impartial Department of the Army officials serving as voting members, at least two of whom will be civilians. The civilian personnel officer or his representative will normally serve as a nonvoting chairman. * * *
Section 6
conduct OE HEARING AND PREPARATION OP RECORDS— PREPARATION FOR HEARING

Employee's Request

6-1. a. * * * Where the complainant was not aware of his right to a hearing, he should be advised of his right and given opportunity to amend his request. In addition, all interested parties involved in the case should be allowed to amend that part of the record to which they contributed prior to the rendering of a final decision by the commanding officer.
32. The District Engineer, New Orleans District, testifying in this case, was given an opportunity to explain his attitude, understanding, and action with respect to the plaintiff’s request for a grievance hearing following receipt by plaintiff of notice that he had been reached in the reduction-in-force procedure. Colonel Hollé testified in part as follows:
* * * This request for a grievance hearing I denied because I do not believe that the remedial action requested is the proper subject for a grievance hearing under the regulations, and, again, under common sense. This basically questions my authority for which I’m solely responsible, of how the business of the district is conducted. It was not a personal matter or an individual matter in which the griever had been unfairly treated. It was a management decision, and the grievance procedure does not extend to employees questioning a management decision, and, certainly, not to have the person in charge of decisions review and in effect tried by a board of his subordinates whom he appoints. That is just contrary to all intent of the grievance procedures.
On that basis I refused to appoint a grievance board.
The remedial action requested was, (a) that “I not be reduced in grade or salary”; that, I claim, is a management decision. It is my responsibility through the personnel job analysis procedures to grade all jobs, and I would be violating the responsibilities and trusts that are placed in me if I hire people at a particular grade in *444 excess of what the duties require, so that the fact that he. should not be reduced in grade to me meant retained without adequate duties. That same thought is portrayed in the second paragraph, that in view of the practice established in former years he be reassigned to another position of the same grade and salary.
* * * the grievance procedures are a device for furnishing, for collecting information and furnishing a recommendation to me. When I become, or am sufficiently familiar with the operations of my district, then the appointing of that grievance board merely to cover the same ground and make recommendations to me serves no useful purpose, and I’m convinced is not the intent of the grievance procedure.
I would like to comment that the decisions which were being aggrieved against were decisions of mine, and it is just inconceivable that I should appoint a board of my subordinates to review, and perhaps, condemn my decisions. Therefore, in denying this grievance request I strictly followed the regulations by advising Mr. Saxon that he had the right of an appeal to my superior, which he did, and if my superior wants to review my decisions, that I, frankly, and freely, and willingly, grant is his responsibility. But it is not contemplated through any grievance proceedings for me to appoint a group of my subordinates to review my administrative and managerial decisions.
Now, if one of my subordinates is charged with a mistreatment of an employee and I do not look into it myself, then I appoint a grievance board, consisting of three impartial and distinterested fellow employees to investigate and to inform me, but I repeat that when the grievance is against me, there can be no proper procedure for the review of my decisions by a group of subordinates.
33. The action of the agents of the defendant in separating the plaintiff from his position was not arbitrary, capricious, nor actuated by malice.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and his petition is therefore dismissed.